IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                No. 2:10-cr-20299-SHM-cgc

**DARNELL MITCHELL,**

    **Defendant.**

---

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS**

---

  Before the Court is Defendant Darnell Mitchell's ("Mitchell") Motion to Suppress. (Docket Entry "D.E." #28). The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation. (D.E. #29). The Court held a hearing on October 24, 2011 and December 2, 2011, after which the parties submitted post-hearing briefs addressing the issues raised in the instant motion. For the reasons set forth herein, the Court RECOMMENDS that Defendant's Motion to Suppress be DENIED.

  **I. Proposed Findings of Fact**

  On April 27, 2010, Jacqueline Fiveash ("Fiveash") drove her parents' Chrysler Sebring, without permission, from Olive Branch, Mississippi to Memphis, Tennessee seeking to acquire drugs. (D.E. #68, Dec. 2, 2011 H'rg Tr. ("Dec. 2, 2011 Tr.") at 34-35, 59). Fiveash testified that she met a guy, whose name she did not know, and, "I let him drive, because I didn't have a driver's license, to South Memphis where we picked up Darnell Mitchell and a few other of his

1

friends, I don't know their names either, and we were getting some cocaine and that's how everything started up." (Dec. 2, 2011 Tr. at 34). Fiveash testified that Mitchell started driving, without permission, and when she tried to get into the driver's seat, "he flashed a gun at me, that's when I knew he had a firearm, he flashed the gun at me." (Dec. 2, 2011 Tr. at 40, 54). At some point, the other individuals exited the car, but Fiveash and Mitchell continued to drive around. (Dec. 2, 2011 Tr. at 43). Fiveash testified that Mitchell had never been in her parents' car before and that she had "never laid eyes on him" before that evening. (Dec. 2, 2011 Tr. at 66). As Fiveash and Mitchell were driving, shots were fired that hit Fiveash parents' car. (Dec. 2, 2011 Tr. at 58, 61). Fiveash testified that, at some time during this, Mitchell pulled out a gun and fired shots as well. (Dec. 2, 2011 Tr. at 58, 61-62). Fiveash testified that, when the gunfire began, she "got down," so she could not be certain if Mitchell fired first or returned fire. (Oct. 24. 2011 Tr. at 69-70).

On April 27, 2010, Durant D. Martin ("Lt. Martin") was employed as a lieutenant with the Memphis Police Department and was patrolling in the high crime area of South Memphis near Riverside and River View Park. Lt. Martin was familiar with this area, which he knew to have a "high incidence of robberies and burglaries and aggravated assaults." (D.E. #62, Oct. 24, 2011 H'rg. Tr. ("Oct. 24, 2011 Tr.") at 8, 16, 43). On the same evening, Officer Matthew Biggs ("Officer Biggs") of the Memphis Police Department was also assigned to Airways Station, Delta Shift, from 5:00 p.m. to 1:00 a.m. and was patrolling the area with Officer Brock. (Oct. 24, 2011 Tr. at 54-55, 61-62).

Immediately prior to 11:00 p.m. on that night, Lt. Martin testified that, as he was responding to an officer call for help in the area of Kansas and Person, "I observed a vehicle

2

operating with the headlights off going in the opposite direction, which would be southbound on Kansas near Dison. I responded to the officer's help call. Maybe a couple minutes later, about two or three minutes later, we received a shots-fired call in that general area where I saw the car going." (Oct. 24, 2011 Tr. at 8-9, 16-17, 43). Officer Biggs also testified that he received the shots-fired call, which provided a vehicle description of a "silver two-door car." (Oct. 24, 2011 Tr. at 55, 61). While responding to the shots-fired call, Lt. Martin pulled up to Ingle westbound and "observed a vehicle parked in the middle of the intersection blocking the intersection with its lights off." (Oct. 24, 2011 Tr. at 9). Lt. Martin testified that this was the same vehicle he had seen moments earlier with its headlights off. (Oct. 24, 2011 Tr. at 10, 13, 37, 39, 43).

Lt. Martin determined that he needed to stop the vehicle due to the driver blocking the intersection, the failure to use headlights, and his concern due to the shots-fired call in that area. (Oct. 24, 2011 Tr. at 38). Lt. Martin turned on his emergency lights and began to approach the vehicle, but the driver "pulled off." (Oct. 24, 2011 Tr. at 10). Lt. Martin testified that the driver made two lefts but eventually pulled over completely on Silver Age. (Oct. 24, 2011 Tr. at 10-11, 18-21). Officer Biggs, who was also in the process of responding to the shots-fired call, went to Lt. Martin's position and likewise observed a vehicle matching the description from the shots-fired call with its headlights off. (Oct. 24, 2011 Tr. at 55-56, 77-78).

Lt. Martin testified that, when he pulled up behind the Sebring, because of the nature of the shots-fired call, he waited a minute to approach the car in order to observe the occupants. (Oct. 24, 2011 Tr. at 11-12, 22-23, 51). Lt. Martin testified that the driver, later identified as Mitchell, was "moving suspiciously as if he was trying to hide something, something with his hand inside the car." (Oct. 24, 2011 Tr. at 11). Lt. Martin proceeded to approach the driver side

3

of the silver Sebring, and Officer Biggs approached the passenger side to assist. (Oct. 24, 2011 Tr. at 56-57, 63). As he approached, Officer Biggs saw the driver making a lot of movements as well as the passenger, "reaching down between her legs towards the floor of the car." (Oct. 24, 2011 Tr. at 56-57, 63). Mitchell then exited the vehicle on his own and officers "could just tell he was—he had been drinking or something because he was just—his eyes were bloodshot. You could smell strong intoxication on his person, acting really erratic. It was obvious." (Oct. 24, 2011 Tr. at 11-12, 23). Officer Biggs testified that he went straight to the passenger and detained her due to the movements, the shots-fired call, the vehicle matching the description, and for officer safety. (Oct. 24, 2011 Tr. at 57).

Officer Biggs testified that as he was opening the door to get Fiveash out of the car, "there was a handle of a black semi-automatic pistol laying 'pretty much in the floorboard.'" The barrel was "kind of concealed by the seat, but it was laying in the floorboard. The handle was plainly in view." (Oct. 24, 2011 Tr. at 57-58, 66, and 73). Officer Biggs testified that he saw the gun handle sticking out before he pulled the passenger out of the car. (Oct. 24, 2011 Tr. at 79). Officer Biggs immediately detained Fiveash to "make sure that the weapon wasn't in play anymore" and then he went back to secure the weapon. (Oct. 24, 2011 Tr. at 66). Fiveash ultimately stated that the weapon belonged to Mitchell, that he handed her the gun during the incident, and that she placed it down underneath the seat, attempting to distance herself from it. (Dec. 2, 2011 Tr. at 45-46, 62-63). In addition to the testimony regarding the gunfire, both Lt. Martin and Officer Biggs recall noticing bullet holes in the side of the car after the arrest occurred. (Oct. 24, 2011 Tr. at 48, 60, 62-63).

While Officer Biggs was detaining Fiveash, Mitchell was placed inside of Officer Biggs'

4

patrol car where he became irate and began kicking and banging on the doors and beating his head against the window. (Oct. 24, 2011 Tr. at 58-59). Lt. Martin testified that they eventually had to use a chemical agent to get Mitchell to comply as well as a rip hobble on his feet to keep him from kicking the door. (Oct. 24, 2011 Tr. at 13, 16, 22, 59). An ambulance was then called to the scene for Mitchell to be examined, and he refused to be treated but was still not compliant. (Oct. 24, 2011 Tr. at 40).

Around the time of the arrest, officers' shifts changed and Officer Thomas Avery ("Officer Avery") of the Memphis Police Department received a call from Lt. Martin asking for an additional car to transport Mitchell from the arrest location to the detective's office at 201 Poplar. (Dec. 2, 2011 Tr. at 8, 11). Officer Avery arrived on the scene at 12:15 a.m., at which point Mitchell and Fiveash were in custody in separate squad cars. (Dec. 2, 2011 Tr. at 14). Officer Avery testified that Mitchell was exhibiting resistant behavior in the arresting officer's squad car when he arrived and that the other officers were unsuccessful in rip-hobbling him. Accordingly, Officer Avery "changed his position from the arresting officer's squad car to my squad car." (Dec. 2, 2011 Tr. at 14).

Officer Avery transported Mitchell to 201 Poplar and prepared the Affidavit of Complaint "based on information gleaned from any or all of the officers, the arresting officers on the scene." (Dec. 2, 2011 Tr. at 12-13, 15). Mitchell was charged with the following offenses: traveling while license revoked, cancelled, or suspended; driving under the influence; reckless driving; resisting official detention; unlawful carrying or possession of a weapon; and, vandalism over $500. The driving without a headlights charge was not included. (Oct. 24, 2011 Tr. at 29-30). However, Lt. Martin testified that he assumed the driving without a headlights charge was

encompassed in the reckless driving charge. (Oct. 24, 2011 Tr. at 29-30). Officer Avery testified that when writing the affidavit of complaint, "most of this information was information that was regurgitated from the arrest ticket, but some of it, I added to basically just polishing it up to get all of the factual alleged probable cause into the affidavit." (Dec. 2, 2011 Tr. at 18). Officer Avery stated that, on this particular evening, the process of preparing the affidavit was complicated by a glitch in the computer system, so he had to wait until later in the process to refer to the arrest ticket in preparing the affidavit. (Dec. 2, 2011 Tr. at 17-19).

On April 29, 2010, thirty-six hours after Mitchell's arrest, Sergeant Veronica Wimbley ("Sgt. Wimbley") of the Memphis Police Department, Robbery Bureau, requested a detective visit with Mitchell to investigate a robbery that occurred on April 24, 2010 where the victims were alleging Mitchell robbed them. (Oct. 24, 2011 Tr. at 80-81). Sgt. Wimbley testified that she asked him, "are we going to have any problem before I sit down with him to talk with him, and he said no, and he didn't give me any problems." (Oct. 24, 2011 Tr. at 83). Sgt. Wimbley testified that Mitchell appeared to be calm and "not intoxicated or anything like that" and appeared to understand what was going on. (Oct. 24, 2011 Tr. at 83, 87, 92). Sgt. Wimbley asked him if he was intoxicated or took any medications regularly, and Mitchell replied, "no." (Oct. 24, 2011 Tr. at 117).

At 11:00 a.m., Sgt. Wimbley then read Mitchell his <u>Miranda</u> rights and instructed him to read aloud to himself his rights, "so that I knew he knew what we were talking about." (Oct. 24, 2011 Tr. at 83-85). Sgt. Wimbley testified that "anytime I deal with the advice of rights, even though they say they understand, I go—Myself go through it again to make sure they understand that you don't have to talk to me, if you want somebody here, you can have somebody here with

6

you, you know, their life on the line" and that, "I'm going to be sure they know what a lawyer is and know what certain terms mean even though they say they may know . . . before I continue on." (Oct. 24, 2011 Tr. at 113). Mitchell waived his rights and signed, initialed, and dated all the Miranda rights read to him. (Oct. 24, 2011 Tr. at 86, 90).

During Mitchell's statement, at 12:30 p.m., Sgt. Wimbley again went over his Miranda rights and asked him to initial that he understood them for a second time, which he did. (Oct. 24, 2011 at 88, 112-113). Sgt. Wimbley testified that she took her time and typed everything he said, asking him to slow down to make sure she was able to type all of the information completely and accurately. (Oct. 24, 2011 Tr. at 90-91, 112). Sgt. Wimbley spent a little over four hours with Mitchell on April 28, 2010. (Oct. 24, 2011 Tr. at 91). Mitchell gave a robbery statement admitting he was there and providing details of who he was with, and he signed it and "he had no problem with it." (Oct. 24, 2011 Tr. at 87, 115).

**II. Proposed Conclusions of Law**

The first issue presented in Defendant's Motion to Suppress is whether the stop and search of the vehicle violated his rights under the Fourth Amendment to the United States Constitution and, if so, whether the evidence of the firearm should be suppressed. The second issue presented in the Defendant's Motion to Suppress is whether the statements obtained from Mitchell, thirty-six hours after his arrest, violated his rights under the Fifth Amendment of the United States Constitution and, if so, whether Mitchell's statement regarding the robbery should be suppressed.

**A. The Stop and Search of the Vehicle**

The Fourth Amendment guarantees "the right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The present case does not involve the issuance of a warrant. Therefore, in cases where no warrant has been obtained prior to the search or seizure, the conduct must "be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." Terry v. Ohio, 293 U.S. 1, 20 (1968). Under this principle, searches and seizures "'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Minnesota v. Dickerson, 508 U.S. 366, 372 (1993) (quoting Thompson v. Louisiana, 496 U.S. 17, 19-20 (1984)).

One of these exceptions to the warrant requirement was recognized in Terry v. Ohio, 392 U.S. 1 (1968), which held that, "'where a police officer observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot,' the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions.'" Dickerson, 508 U.S. at 372-373 (quoting Terry, 392 U.S. at 30). Further, any traffic violation, even a minor one, gives an officer probable cause to stop the offender. United States v. Bell, 86 F.3d 820, 822 (6th Cir. 1996). The Sixth Circuit has stated, "so long as the officer has probable cause to believe a traffic violation has occurred or was occurring, the resulting stop is not unlawful." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993).

A second exception to the warrant requirement is that law enforcement officers may seize evidence of a crime that is in "plain view." See Horton v. California, 496 U.S. 128, 133-34 (1990); Coolidge v. New Hampshire, 403 U.S. 443 (1971). The court states that an "officer did

not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." Horton, 496 U.S. at 136. Additionally, the incriminating character of the evidence must be immediately apparent and the officer must be lawfully located in a place from which the object can be plainly seen. Horton, 496 U.S. at 136-37 (citations omitted).

The United States concedes that Mitchell has standing to challenge the legality of the stop, just not the search, of Fiveash's parents' vehicle. (Govt's Post-Hearing Memorandum at 9).

**1. The Stop of the Vehicle**

The United States Supreme Court has recognized that police may stop a vehicle when probable cause exists to believe a traffic violation has occurred. Whren v. U.S., 517 U.S. 806, 810 (1996). The Sixth Circuit has ruled that any traffic violation, even a minor one, gives an officer probable cause to stop the offender. Bell, 86 F.3d at 822. Additionally, the Sixth Circuit has stated that, "so long as the officer has probable cause to believe a traffic violation has occurred or was occurring, the resulting stop is not unlawful." United States v. Draper, 22 Fed. Appx. 413, 414 (6th Cir. 2001) (citing United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993)). Once the traffic stop has been completed, the passengers cannot be further detained unless something else occurs during the stop that "generate[s] the necessary reasonable suspicion to justify a further detention." Joshua v. DeWitt, 341 F.3d 430, 442-43 (6th Cir. 2003) (quoting United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995)).

In the instant case, Lt. Martin testified that, as he was responding to a "shots fired" call, he "observed a vehicle parked in the middle of the intersection blocking the intersection with its lights off." (Oct. 24, 2011 Tr. at 9). The vehicle was violating Tennessee Code Annotated Section 55-9-406(a) that provides, "the headlights of every motor vehicle . . . shall be displayed

during the period from one half (1/2) hour after sunset to one half (1/2) hour before sunrise." T.C.A. §55-9-406 (2010). Although the Memphis Police Department arrest record does not list a violation of T.C.A. §55-9-406(a), Lt. Martin testified that he observed the infraction occurring and assumed the violation was encompassed in the reckless driving charge listed on the Memphis Police Department arrest record. (Oct. 24, 2011 Tr. at 18-19). At 11:15 p.m., a time of evening that undisputedly requires headlights to be on, Lt. Martin initiated the stop. (Oct. 24, 2011 Tr. at 10-11, 18-21).

Upon review, Lt. Martin observed Mitchell commit a traffic violation pursuant to Tennessee law, and the Sixth Circuit has ruled that any traffic violation gives an officer probable cause to stop the offender. 86 F.3d at 822. Thus, the Court RECOMMENDS that the stop was not unlawful nor in violation of the Mitchell's Fourth Amendment rights under the United States Constitution.

**2. The Search of the Vehicle**

Mitchell asserts that even if the Court finds that the stop was lawful in this case, the police officers nonetheless performed an unconstitutional, warrantless search of the vehicle. (Def's Post Hearing Memorandum of Motion to Suppress at 13). In order to challenge the legality of a search by a law enforcement officer, a defendant must have a "reasonable expectation of privacy in the place searched." Rakas v. Illinois, 439 U.S. 128, 143 (1978). A reasonable expectation of privacy is not created by the subjective expectation of a defendant alone. Instead, courts look at the defendant's interest in the area searched, the measures taken by the defendant to ensure privacy, and society's willingness to recognize the defendant's expectation as reasonable. United States v. Padin, 787 F.2d 1071, 1075-76 (6th Cir.), *cert*

10

*denied*, 479 U.S. 823 (1986).

In United States v. Paredes-Lima, 493 F.Supp.2d 958, 963 (S.D. Ohio 2005), the United States District Court for the Southern District of Ohio considered an analogous situation to the instant case. The Paredes-Lima court held that an unauthorized driver of a vehicle does not have a reasonable expectation of privacy and therefore no standing to challenge the search of the vehicle. Id. The court relied on United States v. Smith, 263 F.3d 571 (6th Cir. 2001), in which the Sixth Circuit refused to adopt a bright line test and stated, "[w]e acknowledge that as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle, and therefore does not have standing to contest the legality of the search of the vehicle." 263 F.3d at 586.

The Paredes-Lima court reasoned that, because the defendant failed to demonstrate that she had an comparable relationship with the owner of the vehicle or that she had been authorized by the owner to drive the vehicle, the defendant is "closely analogous to the unauthorized driver of a rental car, whom the Sixth Circuit noted in Smith is without a legitimate expectation of privacy in the vehicle." 493 F.Supp.2d at 965. In the case at bar, Fiveash testified that Mitchell started driving, without permission, and when she tried to get back in the driver's seat, Mitchell brandished a firearm. (Dec. 2, 2011 Tr. at 40, 54). Additionally, Fiveash testified that Mitchell had never been in her parents' car before that night and that she had never "laid eyes on him before April 27, 2010." (Dec. 2, 2011 Tr. at 66).

The Defendant in this case, similar to the defendant in Paredes-Lima, has failed to introduce any evidence that he had a relationship with the owner of the vehicle or that he had been authorized by the owner of the vehicle to drive the car. In fact, the evidence shows that

Mitchell had no previous relationship with the owner of the vehicle and that he was not authorized to drive the vehicle. Instead, he usurped control by utilizing a firearm to intimidate Fiveash. Therefore, Mitchell is most closely analogous to the typical unauthorized driver of a rental car, whom the Sixth Circuit has ruled in Smith that is without a legitimate expectation of privacy in the vehicle and therefore does not have standing to challenge the search.

Ultimately, the Court RECOMMENDS that the Defendant in this case did not have a reasonable expectation of privacy in Ms. Fiveash's parent's vehicle and therefore lacks standing to challenge the search of the vehicle. Therefore, the Court RECOMMENDS that the evidence of the firearm should not be suppressed.[1]

### B. The Statements Obtained from the Defendant

The Fifth Amendment protects an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under Miranda v. Arizona, 384 U.S. 436, 479 (1966), an individual that is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning" must be provided information on the following "[p]rocedural safeguards" to protect his privilege against self-incrimination:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. While the four warnings of Miranda are "invariable," the Supreme Court has "not dictated

---

1 In addition to Mitchell's lack of standing to assert a Fourth Amendment violation, the unrefuted testimony is that Officer Biggs saw "a handle of a black semi-automatic pistol laying pretty much in the floorboard. The barrel was kind of concealed by the seat, but it was laying in the floorboard. The handle was plainly in view." (Oct. 24, 2011 Tr. at 57-58). Even if Mitchell had standing to challenge the search, the Court RECOMMENDS that the search did not violate Mitchell's Fourth Amendment rights because the gun was in plain view. See Horton 496 U.S. at 133-37.

the words in which the essential information must be conveyed. Florida v. Powell, 130 S.Ct. 1195, 1204 (2010) (quoting California v. Prysock, 453 U.S. 355, 359 (1981); Rhode Island v. Innis, 446 U.S. 291, 297 (1980)). Instead, reviewing courts are to inquire as to whether the warnings reasonably convey to a suspect his Miranda rights. Duckworth v. Eagan, 492 U.S. 195, 203 (1989).

The suspect may waive his or her Miranda rights if the waiver is made "voluntarily, knowingly, and intelligently." 384 U.S. at 444. The Supreme Court, in Moran v. Burbine, 475 U.S. 412, 421 (1986), held that "two distinct dimensions" must be met before a suspect can be found to have waived his Miranda rights:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Id. (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). The government bears the burden of demonstrating both that the Miranda warnings were properly provided and that a suspect voluntarily, knowingly, and intelligently waived his rights. 384 U.S. at 479.

Despite the evidence that Mitchell was advised of his Miranda rights, he argues that the statements made to Sgt. Wimbley on April 29, 2010 were not freely and voluntarily given as a result of his recent intoxication and mental health issues. (Def.'s Post-Hearing Memorandum at 19). As to whether Mitchell waived his rights with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon it, the evidence demonstrates that Mitchell was read his rights by Sgt. Wimbley, read them aloud to himself, and

signed a rights waiver form before his questioning began and again an hour later. (Oct. 24, 2011 Tr. at 84-87). The Rights Waiver Form informed Mitchell of the full scope of his Miranda rights, which Mitchell initialed and signed that he acknowledged but wished to waive. (Def., Exh. 5).

In addition to the written rights waiver, Sgt. Wimbley read Mitchell's Miranda rights to him and then instructed him to read aloud the rights to himself, "so that I knew he knew what we were talking about." (Oct. 24, 2011 Tr. at 83-85). The questioning was thirty-six hours after Mitchell's arrest, and Sgt. Wimbley asked Mitchell if he was intoxicated or took any medications regularly, to which he replied "no." (Oct. 24, 2011 Tr. at 117). An hour and a half after Mitchell signed the waiver form, Sgt. Wimbley again went over his Miranda rights and asked him to initial another waiver of rights form saying he understood them for a second time, and he did. (Oct. 24, 2011 at 88, 112-113) (Def. Exh. 6).

Sgt. Wimbley testified that Mitchell appeared to be "calm" and "not intoxicated or anything like that," and appeared to understand what was going on. (Oct. 24, 2011 Tr. at 83, 87, 92). In addition, Sgt. Wimbley testified that "anytime I deal with the advice of rights, even though they say they understand, I go—Myself go through it again to make sure they understand that you don't have to talk to me, if you want somebody here, you can have somebody here with you, you know, their life on the line" and that, "I'm going to be sure they know what a lawyer is and know what certain terms mean even though they say they may know. . . before I continue on." (Oct. 24, 2011 Tr. at 113).

As to Mitchell's mental health issues, the District Judge ordered him to undergo a mental health evaluation. (Def. Exh. 9). The report states that, "Mr. Mitchell displayed no problems understanding or following directions provided by correctional staff. He had no

14

difficulty comprehending unit rules, complying with routine demands of the environment, remembering scheduled appointments, or participating in the evaluation procedures." (Def. Exh. 9 at 6). Although Mitchell was diagnosed with borderline intellectual function and antisocial personality disorder, he was also diagnosed with malingering. (Def. Exh. 9 at 11). Specifically, the evaluating clinician noted that, "Mr. Mitchell appeared to put forth poor effort and over-reported a number of various psychiatric symptoms. Further, his report of hallucinations was inconsistent with observations of his overt behavior. He also failed to report mood symptoms, currently or in the past, that met the criteria for a mood disorder (e.g., bipolar disorder or major depression)." (Def. Exh. 9 at 11-12). Further, Mitchell's intellectual functioning disorder, the evaluating clinician notes, is not of the severity to be considered a mental defect. (Def. Exh. 9 at 12).

Additionally, the evaluating clinician determined that Mitchell possessed the functional capabilities necessary to proceed to trial and that, "he appeared to understand the nature and consequences of the proceedings against him to be able to assist property in his own defense." (Def. Exh. 9 at 13-14). Lastly, the report noted that, "despite his intellectual limitations and significant personality pathology, Mr. Mitchell demonstrated a sufficient ability to realistically understand the legal process and his pending legal circumstances, and to perform the basic mental tasks required of a defendant." (Def. Exh. 9 at 15). Thus, the evidence from the mental health evaluation of Mitchell shows that he was not in a mental state that impaired his ability to understand his Miranda rights and that he has exhibited the ability to voluntarily and freely waive those rights.

Furthermore, there is no evidence in the record of any manner of threats, promises, or

15

coercion. Sgt. Wimbley did not threaten, yell, or curse at Mitchell to tell her the things in his robbery statement on April 29, 2010. (Oct. 24, 2011 at 90-91). When asked if Mitchell gave his statement on his own free will, without threats, promises, or coercion from anyone, he replied, "Yes ma'am." (Def. Exh. 6). Thus, when a suspects' voluntary decision to answer police officers' questions is made with the 'requisite' comprehension of all information required by Miranda, his waiver is knowing and intentional under Miranda. Colorado v. Spring, 479 U.S. 564, 574-75 (1987).

Accordingly, the Court RECOMMENDS that the Defendant made a knowingly, voluntary, and intelligent waiver of his Fifth Amendment privilege against self-incrimination. Accordingly, the Court RECOMMENDS that the statement Mitchell gave to Sgt. Wimbley regarding the robbery should not be suppressed.

### III. Conclusion

For the reasons stated herein, the Court RECOMMENDS that Mitchell's Motion to Suppress be DENIED.

**DATED** this 1st day of March, 2012.

s/ Charmiane G. Claxton  
CHARMIANE G. CLAXTON  
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**